UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

3-27-06

United States of America      :
                              :
         v.                   :      File No. 2:01-CR-55-1
                              :
John M. Carter                :

<u>MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION</u>
(Papers 209 and 230)

Defendant John M. Carter has filed a motion to
vacate, set aside or correct his sentence pursuant to 28
U.S.C. § 2255.  Carter alleges that his attorney made a
series of mistakes, both at the district court level and
on appeal, that constituted ineffective assistance of
counsel.  The government has opposed the motion.  For the
reasons set forth below, I recommend that Carter's motion
be DENIED.

<u>Factual and Procedural Background</u>

On February 8, 2002, Carter pleaded guilty to
conspiracy to distribute and possess with intent to
distribute cocaine.  In his plea agreement (Paper 105),
Carter acknowledged that he faced up to 20 years in
prison.  In exchange for Carter's plea, the government
agreed to recommend a credit for acceptance of
responsibility if Carter cooperated with the Probation

Office during the pre-sentence investigation and abided by the conditions of his release.  (Paper 105 at 3).  The government also agreed not to oppose a motion for a two point reduction on his base offense level if all defendants in the case entered into plea agreements within four weeks of Carter's plea agreement. Ultimately, the remaining defendants each entered into plea agreements within that four week period.

On June 20, 2002, Judge Sessions sentenced Carter to 108 months in prison to be followed by three years of supervised release.  For reasons discussed more fully below, the sentence included a two-point enhancement for Carter's leading role in the conspiracy, a two-point enhancement for obstruction of justice, and a three-level downward departure based upon Carter's assistance and the totality of circumstances.  The Court did not give Carter credit for acceptance of responsibility.  The sentence was affirmed by the Second Circuit on February 10, 2003. (Paper 204).  Carter filed his instant motion, through counsel, on June 30, 2004.  (Paper 209).

Carter's initial motion sought "to strike" his sentence based upon the Supreme Court's ruling in <u>Blakely</u>

v. Washington.  Id.  Carter subsequently explained that
this initial motion was filed by counsel without his
knowledge or consent.  When the Court sought to
recharacterize the motion as a petition filed under §
2255, counsel allegedly communicated Carter's consent to
the recharacterization, again, without Carter's knowledge
or actual consent.  At Carter's request, the Court has
vacated the recharacterization and has held the initial
motion in abeyance.  On October 31, 2005, Carter filed an
amended motion (Paper 230), *pro se*, seeking relief under
§ 2255 for ineffective assistance of counsel.  Carter has
withdrawn his Blakely claim.

## Discussion

Section 2255 is intended to remedy fundamental
defects in a criminal prosecution.  See United States v.
Addonizio, 442 U.S. 178, 185 (1979).  A court may grant
relief under § 2255 only for constitutional errors, lack
of jurisdiction or an error of law constituting a
fundamental defect which inherently results in a complete
miscarriage of justice.  See Graziano v. United States,
83 F.3d 587, 590 (2d Cir. 1996).  The Supreme Court has
defined a miscarriage of justice as a claim of actual

innocence.  See United States v. Olano, 507 U.S. 725, 736
(1993).  Absent exceptional circumstances such as a
miscarriage of justice, non-constitutional or
non-jurisdictional questions are generally foreclosed to
a § 2255 petitioner if not raised on direct appeal.  See
Brennan v. United States, 867 F.2d 111, 120 (2d Cir.
1989).  An exception to his rule is a claim of
ineffective assistance of counsel, which may be raised
for the first time in a § 2255 proceeding.  See Massaro
v. United States, 538 U.S. 500, 509 (2003).

"[T]he proper standard for attorney performance is
that of reasonably effective assistance."  Strickland v.
Washington, 466 U.S. 668, 687 (1984).  The essence of an
ineffective assistance claim is that counsel's
unprofessional errors so upset the adversarial balance
between defense and prosecution that the trial was
rendered unfair and the verdict rendered suspect.  See
Kimmelman v. Morrison, 477 U.S. 365, 374 (1986).  Thus, a
defendant must establish (1) that counsel made errors so
serious that he was deprived of reasonably competent
representation and (2) that counsel's deficient
performance prejudiced the defense.  See Hernandez v.

United States, 202 F.3d 486, 488 (2d Cir. 2000) (citing
Strickland, 466 U.S. at 687-691)).

     To satisfy the first prong, the petitioner must show
that counsel's representation fell below an objective
standard of reasonableness.  More specifically, the
petitioner must show that "counsel made errors so serious
that counsel was not functioning as the counsel
guaranteed by the Sixth Amendment and the deficient
performance so undermined the proper functioning of the
adversary process that the trial cannot be relied upon as
having produced a just result."  Strickland, 466 U.S. at
687; see also United States v. DiTommaso, 817 F.2d 201,
215 (2d Cir. 1987).  In conducting the ineffective
assistance inquiry, a court must maintain a strong
presumption that counsel's conduct falls within the wide
range of reasonable professional assistance.  See
Strickland, 466 U.S. at 689.  The court should recognize
that counsel is strongly presumed to have rendered
adequate assistance and made all significant decisions in
the exercise of reasonable professional judgment.  See
id. at 690.  In evaluating counsel's performance, the
court is to look to "an objective standard of

reasonableness . . . under prevailing professional norms"
and apply this standard in light of all the circumstances
in the case.  Id. at 688, 690.

When determining the prejudice component of
Strickland, a court must determine whether, absent
counsel's error, it is reasonably probable that the
outcome of the proceeding would have been different.  See
Mayo v. Henderson, 13 F.3d 528, 534 (2d Cir. 1994).  A
reasonable probability is a probability sufficient to
undermine confidence in the outcome.  Strickland, 466
U.S. at 703.

I.   Counsel's Advice to Admit Harassment

Carter's first claim of ineffective assistance is
that he was wrongly advised to admit to harassing a
government witness.  The government claims that Carter
threatened and harassed a young woman named Bridget
Lawson, "an early witness for the Government.  The
harassment included killing Ms. Lawson's cat, breaking
windows in her home, damaging her car and the cars of
family members and making death threats and threats of
sexual violence to her."  (Paper 232 at 1-2).  While
Carter disputes that he ever harassed Lawson, it is

6

undisputed that his attorney, David Williams, Esq.,
persuaded him to admit to the harassment.  In his
discussions with Carter prior to sentencing, Williams
reportedly advised Carter that the harassment of Lawson
could not be used against him at sentencing because it
had occurred before the federal investigation began.  In
reviewing Carter's obstruction-of-justice enhancement on
appeal, the Second Circuit determined that Williams'
advice on this issue was "wrong under our cases."  (Paper
204 at 6).

    The government argues that even without Carter's
admission, the Lawson harassment would have been proved
by the testimony of two co-defendants and a third
witness.  The government further contends that contesting
the harassment, and allowing the "ugly facts" of the
harassment to be a focus of the sentencing hearing, would
have impaired Carter's efforts at obtaining downward
departures for acceptance of responsibility and totality
of the circumstances.  In response, Carter argues that
his alleged harassment of Lawson was litigated in state
court, and that he was able to "disprove" the harassment
by showing "factual inaccuracies and untruths stated by

Miss Lawson . . . ."  (Paper 244 at 2).

There can be no dispute that Williams was wrong when he advised Carter that the harassment of Lawson could not be used in determining his sentence.  Therefore, the question for the Court is whether Carter was prejudiced by that advice.  In order for Carter to show prejudice, he needs to show a reasonable probability that (1) the Court would not have believed the government's three witnesses, and (2) there would have been no other basis for a finding of obstruction of justice.

With respect to the first point, and as noted above, Carter claims that "there was a very good chance he would have disproved the supposed harassment of Ms. Lawson because that is exactly what he did while being represented by Attorney David Williams during the State Case over this supposed harrassment [sic]."  (Paper 244 at 2).  The government has not responded to Carter's contention that the harassment claim was rejected in state court.  If the claim was, in fact, fully litigated and rejected, then it is reasonable to assume the same evidence would have been presented here and that this Court, like the state court, would have rejected the

government's factual assertions.

As to the second point, it can be argued that there was additional support in the record for an obstruction enhancement.  In fact, the Lawson harassment was not the original basis for this enhancement.  At sentencing, the Court based the obstruction enhancement upon co-defendant Bradley Columbia's testimony that Carter had instructed him not to testify before the grand jury.  Although Columbia testified that Carter had offered to forgive his drug debt in exchange for his non-cooperation, the Court did not specifically find this fact.  The Court stated that "the important point, the essence of the obstruction of justice, is the recommendation by this Defendant that Mr. Columbia should not make any statements to the Grand Jury.  That, in my view, is obstruction of justice." (Paper 197, Sentencing Transcript, at 92-93).

On appeal, the Second Circuit held that the Court's factual findings were insufficient, and that Carter might simply have been urging Columbia to assert his rights under the Fifth Amendment.  (Paper 204 at 5).  The court of appeals considered a remand "for clarification as to whether the court had found *either* (1) that [Carter]

9

offered to relieve Columbia's drug debt in exchange for his non-cooperation with the investigation, or (2) that [Carter's] advice to Columbia was given with specific intent to obstruct justice." Id. at 6 (emphasis in original). Given that Carter had admitted to harassing Lawson, however, the Second Circuit determined that this admission was a proper alternative basis for an obstruction enhancement. Id. at 6-8. Accordingly, the Second Circuit affirmed Carter's sentence.

Without the Lawson harassment, it appears that the Second Circuit would have remanded on the issue of Carter's specific intent when instructing Columbia not to testify. The best evidence of this intent was the testimony that Carter had offered to forgive Columbia's drug debt in exchange for his non-cooperation. Columbia's testimony on this point was quite clear. At the sentencing hearing, Columbia testified that once he received a subpoena, Carter told him "not to say anything and told me that other people weren't saying anything either." (Paper 197 at 12-13). At that time, Columbia owed Carter a drug debt of between $8,000 and $10,000. Id. at 13.

10

Q: Did he tell you anything about the debt in connection with you -- with the subpoena?

A: Yes.

Q: What did he say?

A: He said that if I didn't say anything that I wouldn't have to pay for it.

Q: You wouldn't have to repay the debt?

A: Yes.

Id. at 13-14.  On cross-examination, Columbia conceded that he was using cocaine at the time, and that his memory of events was not very strong.  Id. at 25-27.  A second witness recalled that "there was something mentioned" about Carter forgiving Columbia's drug debt, but could not remember who had told her of Carter's offer.  Id. at 43.

Based upon these facts, there appears to have been sufficient evidence for the Court to have made a specific finding as to Carter's intent.  The Second Circuit stated that "[i]f the district court believed that [Carter] offered to relieve Columbia's drug debt in exchange for Columbia's non-cooperation with the investigation, that finding would quite easily fit in the category of facts that 'support the virtually inescapable conclusion that

11

the defendant must have acted with the requisite intent.'" (Paper 204 at 5, citing <u>United States v. Feliz</u>, 286 F.3d 118, 121 (2d Cir. 2002)). In light of Columbia's testimony, this Court on remand would have been able to make a specific factual finding in support of an obstruction-of-justice enhancement.

Given this conclusion, I recommend that Carter's argument with respect to his obstruction of justice departure be denied. However, if upon review of this Report and Recommendation Judge Sessions concludes that the record needs to be supplemented, he may, of course, grant Carter's motion and conduct a new sentencing hearing.

Finally, the Lawson harassment played no role in the Court's refusal to give credit for acceptance of responsibility at sentencing. The Court denied Carter credit for acceptance of responsibility based upon Columbia's testimony, and the fact that Carter had violated his conditions of release by contacting other interested persons, including Columbia, during the weekend before his sentencing. (Paper 197 at 96). Accordingly, Carter suffered no prejudice as result of

Williams' advice that he admit to the harassment of Bridget Lawson, and his claim of ineffective assistance on this point should not succeed.

II.  Failure to Call Witness

Carter's second claim is that Williams should have called co-defendant Ivan Parenteau as a witness.  Carter alleges that it was Parenteau who offered to forgive Columbia's drug debt, and that Parenteau would have testified to this fact.

As discussed above, Columbia's testimony on this point was clear: he owed Carter money for drugs, and Carter offered to forgive the debt in exchange for Columbia's refusal to cooperate with the government. There is no evidence in the record that Columbia owed a drug debt to Parenteau.  Moreover, Carter does not explain why Parenteau, who was also facing sentencing, would have provided such testimony and faced the risk of adverse consequences to his own sentence.  Indeed, as the government properly argues, Parenteau would most likely have invoked the Fifth Amendment had he been called to testify.  This claim of ineffective assistance is, therefore, without merit.

III.  <u>Criminal History</u>

Carter next argues that Williams failed to adequately contest his criminal history calculation, which, Carter contends, "over represented his actual prior convictions." (Paper 230 at 5). Carter was sentenced as a Category III criminal with six criminal history points. In order for him to have qualified for Category II, he needed to have either two or three criminal history points. Because Carter was on probation when he committed his crime, he began the calculation with two criminal history points pursuant to Federal Sentencing Guideline § 4A1.1(d). Therefore, for his argument to succeed, he must discredit all but one of the additional points attributed to him.

In addition to the two points assessed for having committed the instant offense while on probation, the PSR allotted four criminal points for prior convictions under § 4A1.1(c). In fact, the PSR found seven offenses meriting a point under § 4A1.1(c), but only counted four because that is the maximum allowed by the Guidelines under that section. Therefore, Carter must discredit six of the seven points assessed under § 4A1.1(c).

The first two points assessed were for retail thefts. Specifically, Carter stole shoes in 1992, and a gas grill in 1995. Carter argues that these "two petty thefts" should have only received one point, and that they should have counted as relevant conduct. (Paper 230 at 8; Paper 244 at 6). With respect to the claim that the two points overstated his criminal history, Carter has conceded that his attorney made this very argument, without success. (Paper 244 at 6).

As to relevant conduct, § 1B1.3 of the Sentencing Guidelines defines relevant conduct as "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" that "were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. §§ 1B1.3(a)(1)(A), (a)(2); see United States v. Thomas, 54 F.3d 73, 83 (2d Cir. 1995). "Acts may be found to be part of the 'same course of conduct' if the defendant engaged in a repeated pattern of similar criminal acts, even if they were not performed pursuant to a single scheme or plan." Thomas, 54 F.3d at 84 (internal citation omitted).

15

The indictment in this case charged Carter and his co-defendants with narcotics-related activity between 1996 and 1999.  (PSR at 2-3).  This activity included possession and distribution of marijuana and cocaine. Stealing a pair of shoes and a gas grill in years prior to 1996 cannot be said to have been part of the same course of conduct as Carter's subsequent drug activity. These two points for retail theft were, therefore, properly assessed.

Carter also received one criminal history point for possession of marijuana and possession of a stolen television.  Again, retail theft of a television is plainly separate from drug possession and distribution activities.  Even assuming that the possession marijuana was relevant conduct, the theft of the television was countable for purposes of Carter's criminal history calculation.

The PSR further recommended one point for snowmobiling while intoxicated.  Carter contends that this offense is similar to "public intoxication" under § 4A1.2(c)(2), and should therefore be excluded.  The government argues that the offense is more like driving

16

while intoxicated, which is a countable crime under the
Guidelines.  U.S.S.G. § 4A1.2 (Appl. Note 4).  In 2003,
the Vermont legislature made the punishment for
snowmobiling while intoxicated the same as the punishment
for driving while intoxicated, thus strongly suggesting
that those offenses are similar.  See 23 V.S.A. § 3207a;
United States v. Morales, 239 F.3d 113, 118 (2d Cir.
2000) (multifactor test for determining similarity
includes "the perceived seriousness of the offense as
indicated by the level of punishment").  Indeed,
operating a vehicle of any sort while intoxicated is
obviously more serious than merely being intoxicated in a
public place.  Accordingly, the Court should find no
error in Williams' alleged failure to argue against the
one point assessed for snowmobiling while intoxicated.

Carter's remaining contention with respect to his
criminal history is that the three points assessed for
attempting to elude an officer should have been excluded
for being similar to "hindering or failure to obey a
police officer" under § 4A1.2(c)(1).  The facts
underlying Carter's attempts to elude were at times
extreme, including high speed vehicle chases and "driving

17

negligently to the point of losing control on a sidewalk and blowing a tire." (PSR at 27). Nonetheless, attempting to elude an officer under Vermont law is a misdemeanor, with a maximum prison sentence of six months. 23 V.S.A. § 1133.

Even if the Court were to accept Carter's argument with respect to his convictions for attempting to elude police, he would still have six criminal history points (two for committing the offense while on probation and four for the crimes discussed above), thereby placing him at the high end of Category III. Furthermore, Carter had seven convictions for driving with a suspended license, which is a felony under the Guidelines. See 23 V.S.A. § 674; U.S.S.G. § 4A1.2(o). Although the PSR did not recommend allocating any criminal history points for these offenses, it could have at the time, and certainly could at re-sentencing.

Furthermore, the Court took the possibility of over-representation into account at sentencing. Judge Sessions noted at the hearing that Carter's prior offenses were primarily misdemeanors, and that this type of criminal history generally does not result in a

Category III.  He therefore included the nature of Carter's criminal history as support for a totality of circumstances departure.  (Paper 197 at 95-96).

In sum, Carter's criminal history was properly calculated, and the possibility of over-representation was factored into his ultimate sentence.  Accordingly, counsel's performance on this issue was not objectively unreasonable, and did not result in prejudice.  Carter's request for habeas corpus relief on the basis of an improperly calculated criminal history should, therefore, be denied.

IV.  <u>Promises from Counsel</u>

Carter also argues that Williams promised him a sentence that was considerably lower than the one he received.  Carter's wife, Christine, has submitted an affidavit in support of this claim, stating that "Mr. Williams told myself and John that . . . John would receive 37 months from the court, and would more than likely serve that term in a Shock style program, and be released in 6 months."  (Paper 231).  The affidavit also states that Williams promised Carter a maximum sentence of 5 years.  <u>Id.</u>

Carter himself contends that Williams promised him a sentence of 36-46 months, and informed him that a plea under 21 U.S.C. § 841(b)(1)(c) necessarily limited the guideline range to offenses under 500 kilograms of marijuana.  Carter was ultimately sentenced based upon the equivalent of 675 kilograms of marijuana.

At his change of plea hearing, Carter acknowledged that the maximum penalty for his drug offense could include 20 years in prison.  (Change of Plea Tr. 9). Later in the hearing, the Court questioned Carter about any promises or predictions that had been made.

Q: Have you gone over the guidelines with Mr. Williams?

A: Yes, I have, your Honor.

Q: Has anyone made any promises or predictions as to what sentence you are likely to receive?

A: No promise [sic], your Honor.

Q: Do you understand that any promises or predictions as to what sentence you are likely to receive are not binding upon the Court; based upon your guilty plea, I could impose a sentence up to the maximum permitted by law, and that you would not have the right to withdraw your plea if those predictions proved to be inaccurate?  Do you understand that?

A: Yes, I do, your Honor.

Q: Do you also understand that the Court will not be able to determine the guideline range until after a

presentence report has been completed, and you and the
government can file objections to that report?

A: Yes, I do, your Honor.

Q: And as Mr. Williams has just said, in some cases
the Court has the power to impose a sentence that is more
severe or less severe than the guidelines called for, and
that if I were to impose a sentence that was more severe
than the guidelines called for, you still would not be
able to withdraw you guilty plea.

A: Yes, I do, your Honor.

Id. at 18-20.

Carter now claims that "if counsel had relayed to

the Petitioner that he could be sentenced above 46 months

. . . he never would have relinquished his plea of

innocense [sic] . . . ."  This claim conflicts with

Carter's testimony at the change of plea hearing, at

which he acknowledged (1) that no promises or predictions

had been made and (2) that the Court had the power to

sentence him up to the 20 year maximum.  In light of

Carter's acknowledgments to the Court, his claim that he

relied solely, and to his detriment, on counsel's alleged

misadvice is without merit.  See, e.g., Johnstone v.

United States, 1999 WL 672946, at *7 (E.D.N.Y. Aug. 25,

1999) ("Sworn statements made during plea allocutions

carry a strong presumption of validity"); Figueroa v.

United States, 1993 WL 88213, at *8 (S.D.N.Y. Mar. 24, 1993) (when defendant acknowledges court's advice under oath, "'the criminal justice system must be able to rely on the dialogue between the court and defendant'") (quoting United States v. Lambey, 949 F.2d 133, 137 (4th Cir. 1991)); see also Ventura v. Meachum, 957 F.2d 1048, 1058 (2d Cir. 1992) (when court accurately informs defendant of matters under Rule 11, guilty plea may be valid even where counsel misstated "actual sentencing possibilities").

In a related claim, Carter alleges that Williams told him that a charge under 28 U.S.C. § 841(b)(1)(C) could not result in a sentence for over 499 grams of cocaine. Carter also argues that Williams was correct, and that his sentence was erroneous. Section 841(b)(1)(C) is the applicable statute when the charge involves an undetermined amount of drugs. Sections 841(b)(1)(A) and (b)(1)(B) involve certain quantities of drugs, and carry higher maximum and minimum sentences than § 841(b)(1)(C). Specifically, § 841(b)(1)(B) applies when the charge involves more than 500 grams of cocaine or 100 kilograms of marijuana.

Based upon statements by Carter's co-defendants, the PSR concluded that Carter was involved in the distribution of three kilograms of cocaine and 75 kilograms of marijuana.  Using the equivalency tables in the Guidelines, the three kilograms of cocaine was converted to 600 kilograms of marijuana, for a total amount of 675 kilograms of marijuana.  The corresponding Guideline offense level for this amount is level 28. U.S.S.G. § 2D1.1(c).

Carter claims that "[u]nder 21 U.S.C. § 841(b)(1)(C) a person cannot manufacture, distribute [sic] dispense or possess with intent to do the same, more than 500 grams of cocaine or 100 kilograms of marijuana."  This claim misstates the law, since § 841(b)(1)(C) has no limitation as to the amount of drugs involved.  See, e.g., United States v. Vaughn, 430 F.3d 518, 529 (2d Cir. 2005).  The only limitations in § 841(b)(1)(C) are the statutory maximum of 20 years and other penalties.

Notwithstanding Carter's misapplication of the law, he also asserts that Williams promised him a sentence in the range of 36-46 months, since § 841(b)(1)(C) allegedly did not permit sentencing for a drug quantity above 499

23

grams of cocaine.  As set forth above, Carter clearly understood at his change of plea that any promises by counsel were not binding on the Court, and that the Court had the power to sentence him to a maximum of 20 years. Moreover, Carter admitted at his change of plea that no promises or predictions had been made to him. Consequently, the Court should not find that Williams' alleged communications on this issue constituted ineffective assistance of counsel.  See, e.g., Figueroa, 1993 WL 88213, at *8.

V.  Role in the Offense

     Finally, Carter contends that Williams failed to counter the government's claim that Carter was manager or supervisor in the conspiracy.  On the contrary, Williams argued in the sentencing memorandum that "Mr. Carter was not a leader, manager, organizer or supervisor of anyone involved in the conspiracy," noting that Carter's co-defendants were either relatives or "independent contractors" with their own sets of customers.  (Paper 158 at 4).  Williams also refused to concede the issue at sentencing.  (Paper 197 at 85).  Carter's argument is, therefore, misplaced.

<u>Conclusion</u>

For the reasons set forth above, I recommend that Carter's motion for a writ of habeas corpus (Papers 209 and 230) be DENIED.

Dated at Burlington, in the District of Vermont, this <u>24th</u> day of March, 2006.

/s/ Jerome J. Niedermeier
Jerome J. Niedermeier
United States Magistrate Judge


Any party may object to this Report and Recommendation within 10 days after service by filing with the clerk of the court and serving on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  Failure to file objections within the specified time waives the right to appeal the District Court's order.  See Local Rules 72.1, 72.3, 73.1; 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b), 6(a) and 6(e).